# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### October 21, 2014 Session


## LINDA J. RUSSELL, ADMINISTRATOR OF THE ESTATE OF MILFORD R. RUSSELL, JR. V. ILLINOIS CENTRAL RAILROAD COMPANY

### Appeal from the Circuit Court for Shelby County
### No. CT00581510      Jerry Stokes, Judge

---

### No. W2013-02453-COA-R3-CV – Filed June 30, 2015

---

Linda Russell brought a Federal Employers Liability Act action against Illinois Central Railroad Company to recover for the death of her husband from throat cancer; she alleged the cancer was caused by Mr. Russell's exposure to carcinogens while he worked in the Illinois Central maintenance shops in Memphis, Tennessee. A jury found in her favor and awarded damages of $4,255,000.00; on Defendant's motion to offset the judgment in the amount of medical expenses paid on behalf of Mr. Russell, the trial court reduced the judgment to $3,335,685.00. On appeal, Illinois Central asserts the trial court erred in admitting the causation opinions of three of Plaintiff's medical experts; in approving the jury's finding of causation; in making certain evidentiary rulings prior to and during trial; and in denying Defendant's post-trial motions based on the statute of limitations and Plaintiff's counsel's alleged violations of pretrial rulings. In her cross appeal, Mrs. Russell appeals the reduction of the verdict. Finding no reversible error, we affirm the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed.

RICHARD H. DINKINS, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P. J., W. S., and ARNOLD B. GOLDIN, J., joined.

Thomas R. Peters and Mark R. Kurz, Belleville, Illinois; Brooks E. Kostakis and Stephanie Camille Reifers, Memphis, Tennessee, for the appellant, Illinois Central Railroad Company.

Donald N. Capparella, Nashville, Tennessee, and William P. Gavin, Swansea, Illinois, for the appellee, Linda J. Russell, Administrator of the Estate of Milford R. Russell, Jr.

OPINION

This appeal arises out of a negligence action brought pursuant to the Federal Employers Liability Act ("FELA"), 45 U.S.C. § 51 *et. seq.*, by Linda Russell ("Mrs. Russell"), the widow of Milford R. Russell, Jr., ("Mr. Russell") against Illinois Central Railroad Company to recover for the death of her husband, who worked as a mechanic in Illinois Central's Trigg Avenue and Johnston Yard maintenance shops in Memphis from 1974 to 2007. Mr. Russell died on September 20, 2008, of squamous cell oropharyngeal (throat) cancer. Mrs. Russell alleged that her husband's cancer and death resulted from his exposure to asbestos, diesel exhaust, and environmental tobacco smoke ("ETS" or secondhand smoke) during the course of his employment with Illinois Central. He was first diagnosed with throat cancer in 1989 when he was in his 40s and underwent treatment for eight to nine months. He returned to work in 1990, and in 1995, was told by his doctor that he was cured of cancer. He was diagnosed a second time on December 5, 2007.

Mrs. Russell filed suit on December 1, 2010. A two-week trial was held before a jury in April 2013. Twenty-nine witnesses testified at trial, 15 of which were experts. The jury found in favor of Mrs. Russell and awarded her $4,255,000.00. Pursuant to Illinois Central's motion to offset the judgment in the amount of medical bills paid by Mr. Russell's health insurance plan, the jury's award was reduced to $3,335,685.00.

Illinois Central now appeals the judgment, raising numerous issues, and Mrs. Russell appeals the reduction of the verdict.

## I. DISCUSSION

### A. Admissibility of the Opinions of Plaintiff's Expert Witnesses[1]

---

[1] In its brief on appeal, Illinois Central states:

> The expert medical causation opinions rendered by Plaintiff's experts Dr. Arthur Frank, Dr. Michael McClean, and Dr. Karl Kelsey concerning causation of Mr. Russell's oropharyngeal cancer were inadmissible. … These witnesses' professed attempts at a differential diagnosis were not valid, and their resulting "*ipse dixit*" and speculative opinions were neither supported by a proper scientific methodology nor trustworthy. Accordingly, the opinions of Dr. Frank, Dr. McClean, and Dr. Vance regarding both general causation and specific causation did not satisfy Rules 702 and 703 of the Tennessee Rules of Civil Procedure.

Upon a thorough reading of Illinois Central's brief, all challenges to the Plaintiff's expert proof are to the testimony of Dr. Frank, Dr. McClean, and Dr. Kelsey. We consider that the reference to Dr. Vance in this paragraph is made in error and will guide our discussion accordingly. It is also apparent that the reference

We first address Illinois Central's challenge to the admission of the causation opinions of Plaintiff's expert witnesses, Dr. Arthur Frank,[2] Dr. Michael McClean[3] and Dr. Karl Kelsey.[4] All were disclosed by the Plaintiff as expert witnesses who would opine that asbestos, ETS, and diesel exhaust are human carcinogens to which Mr. Russell was exposed during his employment with Illinois Central and which caused, in whole or in part, him to develop the cancer at issue in this litigation.[5] The qualifications of these

---

to "Rules 702 and 703 of the Tennessee Rules of Civil Procedure" is error.

[2] Dr. Frank is a physician and Chair of the Department of Environmental and Occupational Health in the School of Public Health at Drexel University as well as a professor in Drexel's College of Medicine.

[3] Dr. McClean is an epidemiologist who studies the patterns and causes of disease and is an associate professor in the Department of Environmental Health at Boston University School of Public Health.

[4] Dr. Kelsey is a physician, scientist, and professor of epidemiology and laboratory medicine and pathology at Brown University.

[5] Illinois Central filed motions *in limine* to exclude the causation opinions of Drs. Frank, McClean, and Kelsey, asserting that each opinion was "based wholly on speculation, are unreliable, and lack any indicia of trustworthiness" and that "such testimony does not substantially assist the trier of fact." As to Dr. Frank, Illinois Central asserted that his deposition testimony demonstrated "inherently flawed methodology" because he had "a lack of knowledge of the dose of the decedent's alleged occupational exposures." Further, Illinois Central contended that his opinions were unreliable because he "failed to reliably rule out other causes of oropharyngeal cancer such as decedent's history of cigarette smoking and his history of HPV and acid reflux." As to Dr. McClean, Illinois Central asserted that his testimony should not be admitted because he "failed to properly consider dose in arriving at his opinions," because his opinion was based on improper differential diagnosis in which he failed to consider and rule out potential other causes of Mr. Russell's cancer, and because he considered two articles in forming his opinion which Illinois Central claimed were unreliable. As to Dr. Kelsey, Illinois Central asserted that his deposition testimony "failed to establish that any of the substances he identifies (asbestos, diesel exhaust, ETS) caused Mr. Russell's specific type of cancer"; "demonstrate[d] a lack of knowledge of the dose of the decedent's alleged occupational exposures, an inherently flawed methodology underlying his causation opinion"; and showed an "improper reliance upon insufficient foundational data and facts to support his opinions." Illinois Central contended that Dr. Kelsey's reliance on the Paget-Bailly article rendered his causation opinion unreliable.

> The trial court overruled the motions, stating with respect to each expert:
>
> This motion is overruled insofar as Defendant moves for exclusion of [the expert's] opinion testimony based on challenges to the qualifications of Plaintiff's expert, and the reliability, foundation, and trustworthiness of opinions offered by Plaintiff's expert. The Court overrules this motion without prejudice to Defendant's ability to again raise evidentiary challenges to [the expert's] opinion testimony by motion prior to or at trial, should the supplemental deposition of [the expert's] provide an additional basis for such motion.

3

witnesses as experts are not at issue; rather, Illinois Central contends that the court erred in admitting their testimony because their opinions did not satisfy Rules 702[6] and 703[7] of the Tennessee Rules of Evidence.  Specifically, Illinois Central argues:

> These opinions were based upon insufficient or unreliable data – in particular (1) the absence of published scientific or medical support and (2) the experts' admitted failure to measure, quantify or sufficiently consider the dose of claimed exposures – to form a valid scientific basis for the proposition that asbestos, diesel exhaust, or secondhand smoke can cause and did cause Mr. Russell's type of cancer.

### 1. Prevailing Law

The admissibility of scientific proof in the form of expert testimony is governed by Tenn. R. Evid. 702 and 703.  The role of trial courts in applying these rules was explained succinctly in *McDaniel v. CSX Transp., Inc.*:

> In Tennessee, under [Tenn. R. Evid. 702 and 703], a trial court must determine whether the evidence will substantially assist the trier of fact to determine a fact in issue and whether the facts and data underlying the evidence indicate a lack of trustworthiness.  The rules together necessarily

---

For the reasons explained hereinafter, we find no error in the denial of the motions *in limine*.  Other than discussed *infra*, Illinois Central did not raise a subsequent challenge to any of the three experts' opinion testimony prior to trial but raised these issues again in its motion for a directed verdict and its post-trial motions, which were denied, and on appeal.

[6] Rule 702 of the Tennessee Rules of Evidence states:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

[7] Rule 703 of the Tennessee Rules of Evidence states:

> The facts or data in the particular case upon which an expert based an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.  Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.  The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

require a determination as to the scientific validity or reliability of the evidence. Simply put, unless the scientific evidence is valid, it will not substantially assist the trier of fact, nor will its underlying facts and data appear to be trustworthy, but there is no requirement in the rule that it be generally accepted.

*McDaniel v. CSX Transp., Inc*, 955 S.W.2d 257, 265 (Tenn. 1997). When determining whether expert testimony meets the requisites of Rules 702 and 703, the trial court must consider whether the "basis for the witness's opinion, i.e., testing, research, studies, or experience-based observations, adequately supports that expert's conclusions to ensure that there is not a significant analytical gap between the expert's opinion and the data upon which the opinion is based." *Denning v. CSX Transp*., Inc., M2012-01077-COA-R3CV, 2013 WL 5569145, at *5 (Tenn. App. Oct. 9, 2013) (quoting *State v. Stevens*, 78 S.W.3d 817, 834–35 (Tenn. 2002)). The analysis "has four general inter-related components: (1) qualifications assessment, (2) analytical cohesion, (3) methodological reliability, and (4) foundational reliability." *Id.* at *5 (quoting *State v. Scott*, 275 S.W.3d 395, 401–402 (Tenn. 2009)). In making a determination of reliability, the trial court may consider the following non-exclusive factors:

> (1)Whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether, as formerly required by *Frye*[8], the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

*McDaniel*, 955 S.W.2d at 265. These factors are not mandated in every case in which expert evidence is offered and should not be applied unless the factor or factors provide a reasonable measure of the expert's methodology. *Brown v. Crown Equip. Corp*., 181 S.W.3d 268, 272 (Tenn. 2005). The reasonableness of the *McDaniel* factors in assessing reliability depends upon the nature of the issue, the witness's particular expertise, and the subject of the expert's testimony. *Id.* at 277.

Generally, "questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court." *McDaniel*, 955 S.W. 2d at 264 (citing *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993)). We review the decision to admit the testimony of expert witnesses under the abuse of

---

[8] *Frye v. United States*, 293 F. 1013 (D. C. Cir. 1923) (holding that scientific evidence will be admissible only if it has "gained general acceptance in the particular field in which it belongs"). The *McDaniel* Court acknowledged that "Tennessee's adoption of Rules 702 and 703 in 1991 as part of the Rules of Evidence supersede[s] the general acceptance test of *Frye*." *McDaniel*, 955 S.W.2d at 265.

discretion standard. *Id.* A trial court abuses its discretion when it applies an incorrect legal standard or reaches a decision that is contrary to logic or reasoning and that causes an injustice to the party complaining. *Mercer v. Vanderbilt University, Inc.*, 134 S.W.3d 121, 131 (Tenn. 2004). Where the opinions present conflicting scientific views, the court's role is to "analyze the science," but it "need not weigh or choose between two legitimate or conflicting views." *McDaniel*, 955 S.W. 3d at 265. Tenn. R. Evid. 104 favors the admissibility of evidence upon the court's determination that the opinions are based on "relevant scientific methods, processes, and data, and not upon an expert's mere speculation." *Id.* Once admitted, the trier of fact is to determine "the weight to be given to stated scientific theories[] and the resolution of legitimate but competing scientific views. *Id.*

### 2. Reliability of Differential Diagnoses

Plaintiff's experts Drs. Frank, Kelsey, and McClean each used a differential diagnosis[9] to reach the opinion that the cancer which led to Mr. Russell's death was

---

[9] A differential diagnosis is "not a method which lends itself to establishing a 'direct link' between an activity and an injury. Rather it is a method by which a physician 'considers all relevant potential causes of the symptoms and then eliminates alternative causes.'" *Hardyman v. Norfolk & Western Railway Co.*, 243 F.3d 255, 262 (6th Cir. 2001) (citing FEDERAL JUDICIAL CENTER, Reference Manual on Scientific Evidence 214 (1994)).

In the case at bar, Dr. Frank's differential diagnosis was based on Mr. Russell's medical records and death certificate, which were considered to determine the nature of his disease, whether he was a smoker or heavy drinker, and whether the pathology of Mr. Russell's tumor ruled out the sexually-transmitted Human Papilloma Virus ("HPV") as a cause of cancer, as HPV has "been shown in some circumstances to cause certain kinds of throat cancers." He also relied on the statements of Illinois Central employees to determine that Mr. Russell was exposed to asbestos, ETS, and diesel exhaust during the course of his employment.

Dr. McClean testified that he used the medical records and death certificate to determine the nature of Mr. Russell's disease; that he searched the medical and social history for indications that Mr. Russell was a smoker or excessive drinker; and that he requested pathology reports of the tumor because "the vast majority of head and neck cancer can be attributed to some combination of active smoking, drinking, or HPV infection." He also testified that he examined Mrs. Russell's medical history, which was negative for sexually-transmitted HPV, in ultimately ruling out HPV as a cause of Mr. Russell's cancer. He stated that he examined chest x-rays of Mr. Russell, which indicated asbestos exposure, and that he relied on the statements of Mr. Russell's coworkers at Illinois Central and the report of Dr. Vance, an industrial hygienist, to determine that Mr. Russell was exposed to asbestos, ETS, and diesel exhaust during the course of his employment.

Dr. Kelsey testified that he relied on statements of Mr. Russell's coworkers about workplace exposures to carcinogens and on Mr. Russell's "medical history, his social history, his history of smoking, drinking, [because] all these things are important in trying to understand attribution and to make a

caused by carcinogens in the workplace. Illinois Central contends that the experts' opinions were not reliable because the differential diagnoses on which they were based "did not consider the dose, frequency or duration" of Mr. Russell's exposure to carcinogens at work.

The reliability of differential diagnoses was before the court in *Hardyman v. Norfolk & Western Railway Co*., 243 F.3d 255 (6th Cir. 2001), a FELA case in which a railroad employee sought to recover for carpal tunnel syndrome, which he alleged resulted from his work for the railroad. The district court had excluded two expert opinions that the employee's condition was caused by his work on the ground that the opinions were conclusory and unsupported by any objective, reliable methodology; the opinions were based on differential diagnoses. *Hardyman*, 243 F.3d at 261. The Court of Appeals reversed the exclusion of the opinions, holding that a differential diagnosis is "an alternative method of establishing causation," one which may be utilized where the particular facts of the case do not lend themselves to quantitative analysis.[10] *Id.* at 262.

judgment." He considered the role of HPV in possibly causing Mr. Russell's cancer and concluded that "the pathology has been reviewed, and we've done the most you can do to determine whether or not HPV contributed to this disease; and there is no evidence that it did."

[10] The court held:

> [Differential diagnosis] is a process of elimination. Despite this, the district court held that unless Plaintiff could offer a scientific or epidemiological study specifically concerning carpal tunnel syndrome and railroad brakemen, the only way Plaintiff could establish causation would be with the proffer of a known "dose/response relationship" or "threshold phenomenon." Not only does such a requirement ignore the alternative method of establishing causation through differential diagnosis, but it is contrary to the testimony of Plaintiff's experts, *i.e.,* that one simply could not quantify the level or dose of risk factors causative of CTS in a manner consistent with a dose/response relationship or threshold level.

*Hardyman,* 243 F.3d at 262. The court in *Hardyman* was called upon to apply Fed. R. Evid. 702, which is substantially similar to Tenn. R. Evid. 702. In light of the similarity between the rules and in the absence of Tennessee case law specifically discussing the use of a differential diagnosis in determining the admissibility or reliability of an expert's causation opinion, *Hardyman* offers guidance in our consideration of the issues in this appeal. We note the Tennessee cases in which the opinion testimony of experts based a differential diagnosis was admitted; however, the fact that the opinion was based on a differential diagnosis was not a specific issue on appeal in these cases. *See McDaniel*, 955 S.W.2d at 260 n.5 (affirming the admission of plaintiff's treating physician's causation opinion); *Denning*, 2013 WL 5569145, at *6 (holding that the trial court did not abuse its discretion in admitting the causation testimony of the plaintiff's expert and noting that "the weight of [the expert's] testimony was a matter properly determined by the jury."); and *Wells v. Illinois Cent. R. Co*., W2010-01223-COA-R3CV, 2011 WL 6777921, at *8 (Tenn. App. Dec. 22, 2011) (holding that an opinion based on a differential diagnosis is proper for the jury's consideration, and that the opinion was based on "sufficient factual knowledge" which "may be exploited at length on cross-examination.").

The *Hardyman* court also cited with approval the decision in *Westberry v. Gislaved Gummi AB*, 178 F.3d 257 (4th Cir. 1999), which recognized that, while "information concerning the exposure necessary to cause specific harm to humans and exact details pertaining to the plaintiff's exposure are beneficial," such information "is not always available, or necessary, to demonstrate that a substance is toxic to humans given substantial exposure and need not invariably provide the basis for an expert's opinion on causation." *Hardyman*, 243 F. 3d at 265-66 (citing *Westberry*, 178 F.3d at 264). When the information is not available, an expert can still opine that the substance in question caused the plaintiff's illness. *Hardyman*, 243 F. 3d at 266 (citing *Heller v. Shaw Indus., Inc*, 167 F.3d 146, 157 (3d Cir. 1999).

This Court addressed a similar issue in *Wilson v. CSX Transp., Inc*., E2002-00291-COA-R9CV, 2003 WL 1233536, at *1 (Tenn. App. Mar. 18, 2003), where the widow of a railroad worker brought a FELA action against her husband's employer, alleging that his exposure to chemicals at work caused her husband's cancer and subsequent death. Despite the defendant's contention in that case that the plaintiff's expert's opinion was too speculative because it was not based on "quantitative information about the amount of exposure or dosage,"[11] this Court held that the opinion was reliable and thus admissible because it was based on a "qualitative exposure assessment" of the decedent's exposure to cancer-causing chemicals.

As with these cases, the exposures to asbestos, ETS, and diesel exhaust that Mr. Russell encountered at work were not quantified, but Mrs. Russell's medical experts concluded, using differential diagnoses, that the level of exposure was enough to cause his cancer. The various statements and depositions of employees of Illinois Central considered by the plaintiff's experts provided a qualitative assessment of the presence of and exposure to these carcinogens in the maintenance shops. The experts also considered Mr. Russell's social and medical history. From this body of evidence, Drs. Frank, McClean, and Kelsey considered all relevant potential causes of Mr. Russell's cancer and eliminated alternative causes. This is a process that produces a reliable opinion. We now address specific objections Illinois Central makes to the reliability of the opinions of Drs. Frank, McClean, and Kelsey.

### 3. Objections to the Reliability of the Opinions of Drs. Frank, McClean, and Kelsey

#### a. Dr. Frank

---

[11] In *Wilson*, the medical expert explained the difference between the concepts of "exposure" and "dose" as follows: "exposure is the potential for coming into contact with a chemical. Dose implies that [the] chemical has actually gone across the interface of the human body." *Wilson,* 2003 WL 1233536, at *8 n.2.

Illinois Central asserts that Dr. Frank's causation opinion was not reliable because he wrongly "extrapolated research concerning asbestos and laryngeal cancer to the separate condition of oropharyngeal cancer and relied entirely upon assumptions in this case."[12]   As instructed by *McDaniel,* in determining whether Dr. Frank's causation opinion was reliable, we examine whether he based his opinion on "scientifically valid and reliable" methods, processes, and data, and not speculation. *McDaniel*, 955 S.W.2d at 258, 265.

Relying on the statements of Illinois Central employees, Dr. Frank determined that Mr. Russell was exposed to asbestos, ETS, and diesel exhaust during the course of his employment.  Dr. Frank testified that the International Agency for Research on Cancer ("IARC") and other independent bodies have concluded that those three substances are human carcinogens; that there are scientific studies which provided support for his opinion that asbestos and the polycyclic aromatic hydrocarbons ("PAHs")[13] in ETS and diesel exhaust are carcinogenic in the oropharynx; and that tonsils are part of the oropharynx, an area which has been studied with respect to the three carcinogens at issue in this case. Dr. Frank also testified that he relied on peer-reviewed research studies and data "from around the world" showing that tobacco smoke causes a wide variety of cancers in the oropharynx as well as studies examining the oropharynx with respect to the three carcinogens at issue to conclude that exposure to asbestos and the PAHs in diesel exhaust and ETS at his workplace caused Mr. Russell's cancer.

A trial court assessing reliability "need only apply those *McDaniel* factors that it

---

[12] Illinois Central argues that Dr. Frank only considered research that linked asbestos to cancer of the larynx and used it to form his opinion that asbestos could cause cancer of the oropharynx. Dr. Frank's testimony to which Illinois Central cites in support of its position, however, undermines the argument; Dr. Frank testified specifically that asbestos causes oropharyngeal cancers.  When he was asked "What kinds of cancer does asbestos cause?," Dr. Frank answered:

> … [O]ther data has come along that other kinds of cancers can be found. Kidney cancer and then what will be relevant I think for today is that we get what's called oropharyngeal cancer, cancer in the mouth and throat area.  And laryngeal cancer, cancer of the voicebox, has been clearly shown to be related to asbestos as have other cancers in the area of the throat and back of the throat as well.…

He went on to answer the following question about both asbestos and tobacco smoke:

> Q.    Do the larynx and the oropharynx have the same reactions to carcinogens?
> A.    Can they both become cancerous after being exposed to tobacco smoke?  In that sense, yes.  To asbestos, yes. I don't know about other carcinogens.

[13] Polycyclic aromatic hydrocarbons are a family of chemicals that can cause cancer.

9

finds reasonably measure the reliability of the particular expert's methodology." *Brown*, 181 S.W.3d at 281. One of the factors a court may consider is whether the evidence has been subjected to peer review or publication. *McDaniel*, 955 S.W.2d at 265. A trial court may conclude that an expert's opinions are reliable "if the expert's conclusions are sufficiently straightforward and supported by a 'rational explanation which reasonable [persons] could accept as more correct than not correct.'" *Brown,* 181 S.W.3d at 275 (citing *State v. Stevens*, 78 S.W.3d 817, 834 (Tenn. 2002)). Dr. Frank's conclusions based on these studies were not an improper extrapolation, as his trial testimony was sufficiently straightforward and supported by the type of rational explanation contemplated in *Brown*. The trial court did not apply an incorrect legal standard in determining that Dr. Frank's opinion was reliable under Rules 702 and 703 and in permitting the jury to hear it. The weight to be given his testimony was a matter properly assigned to the jury.

### b. Dr. McClean

Illinois Central asserts that "Dr. McClean's causation opinions were based on the Paget-Bailly article, which is a meta-analysis of 63 articles with numerous flaws, and his resulting opinions were therefore unreliable." The underlying articles' flaws, according to Illinois Central, are the failure to control for HPV, smoking, and excessive drinking.[14]

Dr. McClean testified that he found the Paget-Bailly article reliable and that it was one of the documents he relied on it in forming his opinion; he acknowledged that the underlying studies did not control for confounding factors. He testified that HPV was not known as an established risk factor for cancer until five years prior to trial; that failing to control for a factor like HPV does not prevent researchers from seeing the effects of another factor[15]; that the underlying studies varied in whether they included data on

---

[14] The article, *Occupational Exposures to Asbestos, Polycyclic Aromatic Hydrocarbons and Solvents, and Cancers of the Oral Cavity And Pharynx: A Quantitative Literature Review*, Sophie Paget-Bailly, et. al, INT ARCH OCCUP ENVIRON HEALTH (2012) 85:341-351 ("Paget-Bailly") is, according to Illinois Central, "a meta-analysis of 63 articles which summarized epidemiological findings on exposure to asbestos, polycyclic aromatic hydrocarbons and solvents, and cancers of the oral cavity and pharynx."

[15] During cross examination, Dr. McClean testified as follows:

> Q:     Controlling for HPV when you do the -- when you focus on the tonsil is important or you confound your studies -- or you corrupt your studies.
> A:     Well, I think there's an important distinction here that it's whether the study that you're doing could still be informative even if you are not controlling for HPV.
> Q:     Because the group gets too small?
> A:     It's not just because the group gets too small. Do you mean if you do control for HPV, it gets too small?

potential confounding factors; and that he relied on more research than the Paget-Bailly article in forming his opinion, as reflected in his testimony pertaining to his review of the body of research available on cancers of the pharynx, larynx, and lung – the reliability of which Illinois Central does not attack on appeal.

Considering the entirety of Dr. McClean's testimony, that his opinion was based on more supporting facts and data than the Paget-Bailly article, and that he acknowledged and explained what Illinois Central asserts are limitations in that article, we have an insufficient basis on which to conclude that relying in part on the Paget-Bailly article renders his opinion unreliable.[16] The trial court did not abuse its discretion in admitting

> Q:    If you control for HPV, your group gets too small and you may lose significance, correct?
> A:    Well, not necessarily. You're adding a variable to the model and the more variables you add to a statistical model, the more people you need to be able to account for all the many factors you're trying to look at. When the data sets get small is when you actually stratify. So if we start out with a population like in our study of head and neck cancer which includes all oral, all pharynx, all larynx and everyone is together, that -- we can do an analysis based on that whole population. But then when we subdivide and we look at just the oral, just the pharynx, just the larynx, we now have three much smaller data sets. And then it gets more difficult to find our answers. But in terms of what you were saying about HPV, when we look at -- there are certain substances where we wouldn't expect HPV to affect the role of those substances. And even if it's a substance where we would expect it to affect, something like tobacco, so we've observed, as you mentioned in our study that tobacco -- the effect of tobacco is different whether your [sic] HPV positive or negative. If we don't control for HPV, and our earlier studies didn't control for HPV, we would still see an effect of tobacco, but it's when we control for HPV, we see an even stronger affect [sic] of tobacco.

[16] We note that Illinois Central's expert, Dr. Peters, testified that he considered some of the same studies as Drs. Kelsey and McClean in forming his opinions:

> Q:    You reviewed the same information that Dr. Kelsey and McClean did, didn't you?
> A:    For the most part, yes.
> Q:    And the bottom line here is you just disagree with their opinions, correct?
> A:    I don't necessarily just disagree with their opinions. I think our approaches may have been slightly different.
> ***
> Q:    You did tell us that what you did as an epidemiologist is you look at all of the articles and many different factors of the whole consideration, correct?
> A:    Yes.
> ***
> Q:    You have to look and see what they studied, how they studied it, whether it's a well-constructed study and many different, things, right?
> A:    Yes.

the testimony of Dr. McClean.

### c. Dr. Kelsey

Illinois Central asserts that "Dr. Kelsey's opinions had no reliable scientific basis, nor were they supported by a valid methodology." Illinois Central argues that Dr. Kelsey's causation opinion should have been excluded because only a small quantity of academic literature has discussed the association between asbestos, diesel exhaust, and ETS to oropharyngeal cancer, while his own research studies on oropharyngeal cancer listed only smoking, alcohol, and HPV as the three major risk factors. Defendant's four-sentence argument on this point categorizes Dr. Kelsey's testimony as "underwhelming" and then briefly quotes the trial court's denial of Defendant's Motion for a Directed Verdict in which the court remarked, "Dr. Kelsey was not the strongest expert we've heard to date."

We have reviewed Dr. Kelsey's testimony and note that he reviewed the same medical records, pathology reports, depositions, statements, and some of the same research articles that both parties' experts relied upon in forming their opinions. A sufficient basis existed for Dr. Kelsey's causation opinion, which was properly put before the "jury to consider legitimate but conflicting views about the scientific proof." *McDaniel*, 955 S.W.2d at 266. The trial court did not abuse its discretion in allowing the jury to hear Dr. Kelsey's testimony.

In summary, we affirm the trial court's decision to admit the causation opinions of these three experts.

### B. Sufficiency of the Evidence of Causation

Illinois Central asserts that there was no material evidence to support the jury's finding that Mr. Russell's cancer was caused by his occupational exposure to asbestos, diesel exhaust, or ETS. Specifically, Illinois Central contends that the causation opinions of Drs. Frank, McClean, and Kelsey are not "sufficient, reliable evidence that asbestos, diesel exhaust, or ETS is capable of causing oropharyngeal cancer."

When a jury verdict has been approved by the trial court, the scope of our review is limited to whether or not the record contains any material evidence to support the

---

Q: And that's what you did and that's what Drs. Kelsey and McClean did, didn't you?
A: Yes.

12

verdict.[17] Tenn. R. App. P. 13(d); s*ee Harper v. Watkins*, 670 S.W.2d 611, 631 (Tenn. Ct. App. 1983); *Lassetter v. Henson*, 588 S.W.2d 315, 317 (Tenn. Ct. App. 1979). We must take the strongest legitimate view of all the evidence to uphold the verdict, assume the truth of all that tends to support it, discard all evidence to the contrary, and allow all reasonable inferences to sustain the verdict. *Moore v. Bailey*, 628 S.W.2d 431, 433 (Tenn. Ct. App. 1981); *Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 823 (Tenn. 1994). Similarly, the United States Supreme Court has held that in FELA cases where "'there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion' and '[o]nly when there is a complete absence of probative facts to support the conclusion reached['] (by the jury) [']does a reversible error appear.'" *Dennis v. Denver & R. G. W. R. Co.,* 375 U.S. 208, 210 (1963) (quoting *Lavender v. Kurn*, 327 U.S. 645, 653 (1946)).

Through the opinions of Drs. Frank, McClean, and Kelsey, the jury heard evidence that Mr. Russell's cancer was caused by his exposure to asbestos, diesel exhaust, or ETS in the workplace.[18]  Because those opinions were offered to prove causation, an element of the Plaintiff's negligence claim, they were material.  As we held in section A, these opinions were reliable and admissible. Thus, the jury was presented with material evidence upon which it could find that Mr. Russell's cancer was caused by workplace exposure to carcinogens.

## C. Evidentiary Rulings During Trial

Illinois Central contends that the trial court made several erroneous evidentiary rulings during its examinations of Plaintiff's experts Drs. Vance, McClean, Westra,[19] and Kelsey and during its examination of Duane Amato.[20]

---

[17] This Court has determined that "the concept of materiality does not relate to the weight of evidence" but instead "involves the relationship between the proposition that the evidence is offered to prove and the issues in the case." *Kelley v. Johns*, 96 S.W.3d 189, 194 (Tenn. Ct. App. 2002).  "Evidence that does not relate to a matter in issue is immaterial." *Id.* at 194-195 (internal footnote omitted).

[18] Further, Illinois Central's expert, Dr. Peters, agreed on cross examination that it is biologically plausible that ETS can cause oropharyngeal cancer and that the exposure to ETS Mr. Russell encountered while working for railroad could have contributed to his cancer.

[19] Dr. William Westra is a physician and professor of surgical pathology at Johns Hopkins University Hospital.  He examined the slides of tissue and pathology reports from Mr. Russell's 2007 cancer and testified that the cancer was not HPV-related.

[20] Duane Amato is a certified industrial hygienist who testified as an expert on behalf of Illinois Central. He testified about the state of knowledge of railroads in the 1950s pertaining to asbestos; the level of exposure to asbestos, diesel exhaust, and secondhand smoke at the shop where Mr. Russell worked; and Illinois Central's policies pertaining to smoking.

## *1. Standard of Review*

Decisions regarding the admission or exclusion of evidence are entrusted to the trial court's discretion and will not be disturbed on appeal unless the trial court abused its discretion. *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008) (citing *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004); *State v. James*, 81 S.W.3d 751, 760 (Tenn. 2002). An abuse of discretion occurs when the court applies incorrect legal standards, reaches an illogical conclusion, or employs reasoning that causes an injustice to the complaining party. *Banks*, 271 S.W.3d at 116 (citing *Konvalinka v. Chattanooga–Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)). When we review the trial court's exercise of discretion, we presume that the court's decision is correct and review the evidence in a light most favorable to upholding the decision. *Lovlace v. Copley*, 418 S.W.3d 1, 16-17 (Tenn. 2013) (citing *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011)). As noted in *White v. Vanderbilt University*:

> Appellate courts will set aside a discretionary decision only when the trial court has misconstrued or misapplied the controlling legal principles or has acted inconsistently with the substantial weight of the evidence. Thus, a trial court's discretionary decision should be reviewed to determine: (1) whether the factual basis for the decision is supported by the evidence, (2) whether the trial court identified and applied the applicable legal principles, and (3) whether the trial court's decision is within the range of acceptable alternatives. Appellate courts should permit a discretionary decision to stand if reasonable judicial minds can differ concerning its soundness. …The erroneous exclusion of evidence will not require reversal of the judgment if the evidence would not have affected the outcome of the trial even if it had been admitted.

21 S.W.3d 215, 222-23 (Tenn. Ct. App. 1999).

## *2. Application of Tenn. R. Evid. 618*

Illinois Central contends that the trial court misapplied Tenn. R. Evid. 618[21] by

---

[21] Tenn. R. Evid. 618, "Impeachment of Expert by Learned Treatises," reads:

> To the extent called to the attention of an expert witness upon cross-examination or relied upon by the witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness, by other expert testimony, or by judicial notice, may be used to impeach the expert witness's credibility but may not be received as substantive evidence.

requiring counsel to establish that certain articles were reliable and authoritative as a precondition of their use for impeachment purposes.[22]

The trial court properly required Illinois Central to establish that the articles with which it sought to impeach the credibility of Plaintiff's experts were a "reliable authority" as required by and within the meaning of Rule 618. We view the requirement that the treatise be a "reliable authority" as foundational, i.e., that, as a baseline requirement, the work be established through testimony as an "authority" or "authoritative" and, equally important, that it be established as "reliable." In this manner, the objective of Rule 618 — that the material used to undermine the expert's testimony have sufficient worthiness — is reached. In light of the qualifications and process by which a witness may be permitted to testify as an expert, it is appropriate that requirements of equal dignity be imposed on the material used by a party seeking to impeach that expert's credibility. The trial court's rulings in this case were consistent with the letter and the spirit of Tenn. R. Evid. 618 and were not an abuse of discretion. *See McCay v. Mitchell*, 463 S.W.2d 710, 721 (Tenn. Ct. App. 1970) (noting that "[t]he extent and type of proof required to establish the authoritative nature of the medical book or treatise is a matter largely within the discretion of the trial judge").

In contending that the court erred in its application of Rule 618, Illinois Central cites us to several specific instances during the cross examination of Dr. Vance in which it sought to use scientific studies by various researchers[23] to undermine his credibility.

---

In Tennessee, an expert can be impeached by testing his knowledge with a learned treatise established as a reliable authority; this is typically accomplished by counsel reading a portion of the treatise and asking the expert whether or not she agrees, then comparing the treatise with the expert's response. Tenn. R. Evid. 618; *Hunter v. Ura*, 163 S.W.3d 686, 701 (Tenn. 2005) (citing Neil P. Cohen, et al., *Tennessee Law of Evidence* § 618.2 (4th ed. 2000)).

[22] Illinois Central argues in its brief that "the discrete standards for impeachment of experts using learned treatises and the testing of their opinions using materials they have relied upon were actually conflated by the trial court…" during its cross examination of Plaintiff's experts. In support of its position, Illinois Central cites several sidebar conferences and comments from the court and opposing counsel during the examinations of various witnesses. From our review of the record, we fail to see the alleged conflation of Tenn. R. Evid. 618 and 703 on the part of the trial court. Thus, we will discuss each rule and address whether the actual rulings of the court were error affecting the outcome of the trial.

[23] Those studies were: the Fleischer-Drinker report, which was a 1940s study of shipyard workers co-authored by Dr. Philip Drinker, an industrial hygienist whom Dr. Vance agreed was "authoritative for the time" but did not testify whether his work was "reliable"; Sir Richard Doll's 1950s study on asbestos and lung cancer, the contents of which Dr. Vance did not recall; Dr. Lanza's 1930s article on asbestos in the textile industry, which was published in *The Journal of the American Medical Association* and the contents of which Dr. Vance was unfamiliar; and Dr. Isadora Kaplan's 1950s study on diesel exhaust, also published in *The Journal of the American Medical Association* and with which Dr. Vance was not

15

Illinois Central complains that it was required to establish the works as "reliable authorities" before being permitted to discuss their contents. Dr. Vance did not testify at any point that these studies were reliable authorities as required by the Rule. The specific rulings by the trial court to which we have been cited include sustained objections to hearsay, lack of foundation, or to the form of the question. Considered in context, these objections flowed from the failure of Illinois Central to lay a proper foundation for its intended use of the studies by establishing them as reliable authorities, with the exception of one ruling pertaining to a work by Dr. Harvey Bartle to be discussed below. We conclude that the court did not misapply the rule.

Counsel for Illinois Central attempted to cross examine Dr. Vance using a book on industrial hygiene authored by Dr. Lanza in 1939 and a chapter it contained written by Dr. Harvey Bartle. Dr. Vance testified that the book was a reliable authority, and the following exchange occurred:

> Q. In that publication by Dr. Bartle, he actually was asked by Dr. Lanza to write a whole chapter on problems in the railroad industry, correct?
> A. Yes, sir.
> Q. Medical problems?
> A. Medical problems, right.
> Q. He wrote 20 or 30 pages or 15 pages on the very topic of railroad industrial hygiene, correct?
> A. Well, he wrote about medical problems. Dr. Bartles was – he wrote as a physician talking about medical surveillance, in fact.
> Q. And in that document, about half a page, he actually talked about occupational diseases in the railroad industry, correct?
> A. I don't remember without looking at it. I haven't seen it in years.
> ***
> [Witness was handed a copy of the chapter and read it.]
>
> Q. Okay. And in that document, they – Dr. Bartles, in that chapter, never mentions asbestos is an occupational disease known on the railroad, correct?
> MR. GAVIN: Excuse me.
> A. Well, we talked about --
> MR. GAVIN: Pardon me, Doctor. Your Honor, again, I object. This is not the proper use of something that's -- a witness has identified as authoritative. It doesn't open the door to just talk about the document at length. An authoritative document is used to impeach a witness on a particular point or

_____

familiar. Illinois Central contends that both the Lanza and Kaplan studies undermine the credibility of Dr. Eric Garshick's 1980s report on diesel exhaust as a carcinogen, on which Dr. Vance relied in forming his opinion.

not.

THE COURT: All right. Sustained.

BY MR. PETERS:

Q.      You indicated in your testimony that the railroads were talking in the '30s about asbestos disease, correct?

A.      Yes, sir.

Q.      When Dr. Bartles was talking about occupational disease in 1939, is there any mention of asbestos?

A.      Well, there's a four-paragraph section that takes up about a half a page entitled Occupational Disease, and the word asbestos does not appear in those four paragraphs.

Q.      In fact, there's nothing even remotely indicating asbestos, correct?

A.      Well, it was smoke and gas. It –

Q.      Is asbestos a smoke or gas?

A.      Well, no, it's a dust.

It is not clear from Illinois Central's brief or the transcript what the basis of this objection, which the court sustained, was; Illinois Central contends the objection was "unfounded in law" without explaining what that law was or how the Defendant was prejudiced by the ruling. Reviewing the question and answer in context, it is apparent that Illinois Central continued to cross examine the witness about Dr. Bartle's chapter without objection. Consequently, we find no basis upon which to conclude that the court abused its discretion in ruling as it did.[24]

Illinois Central also quotes in its brief an excerpt of the testimony it sought to elicit from Dr. Vance relative to the 1955 Sir Richard Doll study and states that the sustained objections show "prejudicial error." In the ruling quoted, the court sustained Plaintiff's objection to a question that called for inadmissible hearsay. Illinois Central also quotes its offer of proof pertaining to this study but does not state the manner in which it alleges the court erred or why appellate relief is required.[25] In our review of the

---

[24] Illinois Central also contends that a "harmful error" occurred when the trial court sustained Mrs. Russell's objection to Illinois Central presenting the Bartle chapter to the jury after having "clearly showed the trial court that it did not intend to admit it as substantive evidence or send it to the jury, but merely to show it to Dr. Vance during cross-examination, either on a screen or by handing it to him." The transcript reveals that Illinois Central twice attempted to admit the chapter into evidence and was able to pass the chapter to the witness for review. Because Rule 618 provides that the work used to impeach the credibility of a witness is not to be received as substantive evidence, the court did not err in not allowing Illinois Central to display the text of the Bartle chapter to the jury.

[25] The portion of Illinois Central's brief pertaining to the Doll study, in its entirety, reads:

Another prejudicial error occurred during Defendant's cross examination of Dr. Vance

17

trial transcript and the offer of proof, we discern no error.

Finally, as this Court held in *McCay,* 463 S.W.2d at 720 (Tenn. Ct. App. 1970), "[W]here the expert being cross-examined does not or will not acknowledge the medical authority presented, the authoritative character of the book or treatise offered for the purpose of cross-examination must be proven by independent evidence." Illinois Central's contends that "[T]he prospect of being permitted to establish the foundation with a later witness, such as Defendant's experts . . . was permanently foreclosed by the trial court in so rigidly construing these rules and often admonishing Defendant's counsel when such efforts were attempted during cross-examination of Dr. Vance and Dr. McClean." However, Illinois Central has not cited any instances where it made an attempt to introduce the materials through other witnesses but was prevented from doing so. We do not agree that the rulings of the court which Defendant has cited "permanently foreclosed" the Defendant from introducing this evidence in a more appropriate manner.

### *3. Application of Tenn. R. Evid. 703*

Illinois Central asserts that the trial court misapplied Tenn. R. Evid. 703 during the

---

using the study of Dr. Doll in 1955 when Defendant merely brought up a study:

Q.      Do you remember how many subjects were in the Doll report in 1955?
A.      I don't.
Q.      If I told you 20, would you disagree?
Mr. Gavin: Your honor, we're back to where we started here. We're bringing up studies and talking about what's in them. It's hearsay.
The Court: Sustained.

[Citation to the record.] Again, Defendant submitted an offer of proof on this topic:

Q.      Are you aware of Dr. [Doll]'s study in 1955?
A.      I'm aware of it, yes.
Q.      And in that study, you found approximately 20 cases of lung cancer, correct? Yeah, probably 20 cancers of lung cancer.
A.      I don't remember the details of the study. I'd have to reread it in order to remembers what the numbers were.
Q.      And do you agree with me, Doctor, that the overwhelming majority of those people had asbestosis?
A.      I don't recall without reading the study.
Q.      And did Dr. [Doll] conclude on that basis that because he had made that conclusion or made that finding that you needed asbestosis before you could relate lung cancer to asbestos in 1955?
A.      I don't know the answer to that question.

[Citation to the record.]

18

cross examination of Dr. McClean about the Paget-Bailly meta-analysis, a study which Defendant contends was flawed because it consisted of many studies which did not control for HPV, a cause of oropharyngeal cancers. Defendant asserts the following ruling was a prejudicial error affecting the outcome of the trial:

> Q. And part of your disclosure, there's an article entitled -- by Paget-Bailly entitled, Occupational exposures to asbestos, polycyclic aromatic hydrocarbons and solvents, and cancers of the oral cavity and pharynx: A qualitative literature review. Correct?
> A. Yes.
> Q. And that's one of the documents you relied upon?
> ***
> A. That is one of the documents, yes.
> Q. And that document published by Sophie Paget-Bailly is reliable?
> A. Yes, I found it to be.
> Q. And it's reliable to people in your field, correct?
> A. Yes.
> Q. In that study, they state on Page 348 --
> MR. GAVIN: Excuse me, Mr. Peters --
> THE COURT: Sustained.
> MR. GAVIN: -- this violates Rule 703.
> THE COURT: Sustained.

During the hearing on post-trial motions, the trial court held that the above ruling was error, stating:

> THE COURT: . . . A proper predicate was laid and you cited it in your submission, and that should have been allowed. And I made notes, I think you're correct. Though error, I don't think it was reversible error. Nor do I believe, based on the Sophie Paget-Bailly study, that that would have changed the verdict. But I do agree with you that Mr. Peters did, in fact, lay the proper predicate and that is one that I should have allowed.

Under Rule 703, the opponent of expert evidence is not prevented from asking about the underlying facts or data on which an expert opinion is based. Because Dr. McClean testified that he relied on the Paget-Bailly article in forming his opinions, Rule 703 permitted Illinois Central to question him about this article.[26] The trial court

_____

[26] Illinois Central's argument, as we perceive it based on the organization of its brief, is that this ruling also prevented the impeachment of Dr. McClean's credibility as permitted by Rule 618. It is clear that Rule 703, not 618, applies because the witness was asked about a study on which his opinion was based, not about a study he did not rely on or consider with which to impeach his credibility. Consequently, we

19

prevented Defendant from doing so. The ruling was error; Illinois Central should have been permitted to interrogate further.

An erroneous exclusion of evidence is harmful "when 'considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.'" *See In re Estate of Smallman*, 398 S.W.3d 134, 152 (Tenn. 2013) (quoting *State v. Gomez*, 367 S.W.3d 237, 249 (Tenn. 2012)); *see also* Tenn. R. App. P. 36(b). Consequently, we examine the offer of proof and the record to determine whether the judgment was affected by the exclusion of evidence pertaining to the Paget-Bailly study.

In its reply brief, Illinois Central argues:

Important limitations and findings in Paget-Bailly undermining Dr. McClean's and Dr. Kelsey's opinions, which Defendant was foreclosed from testing on cross-examination pursuant to Rule 703, included the following:

Overall, the evidence regarding occupational factors for cancers of OC [oral cavity] and pharynx remains inconclusive . . .

Another limitation is that an important proportion of cohort studies do not present findings on cancers of the OC and pharynx, mainly because these cancers were not the cancers of interest to them.

Cohort studies also typically lack data on potential confounding factors, such as smoking and alcohol drinking, the major risk factors for oral and pharyngeal cancers.[27]

_____

resolve the issue under Rule 703.

[27] These three points are taken verbatim from the Paget-Bailly article. In addition to these points, Illinois Central also argues in its reply brief that "the jury was not allowed to hear evidence that most of the studies underlying the Paget-Bailly meta-analysis failed to control for HPV, now known to be a primary cause of oropharyngeal cancers." Though Dr. McClean testified regarding HPV and its role in causing cancer, as well as how to assess the validity of a study that does not control for certain confounding factors such as HPV, we do not see, nor are we cited to, an instance where Illinois Central attempted to ask about HPV in relation to this particular study. Even in the portion of the deposition testimony of Dr. McClean to which Illinois Central cites us in support of its position, Dr. McClean's answer is not definitive. When asked whether the underlying studies controlled for HPV, Dr. McClean testified, "I can't say for sure, but I would guess that most did not. It's only been very recently that HPV has become in the literature as an established risk factor for head and neck cancer; and, because most of these studies were published in 2010 and earlier, I would think that most probably did not."

20

From our review of the trial transcript, it is apparent that Illinois Central was able to ask Dr. McClean about the asserted limitations of the Paget-Bailly article. Illinois Central specifically questioned Dr. McClean whether: (1) the evidence was inconclusive regarding occupational factors for cancers of the oral cavity and pharynx, and (2) the underlying studies used in the article "lacked data on potential confounding factors," such as smoking and alcohol drinking, the major risk factors for oral and pharyngeal cancer. This is illustrated in the following testimony of Dr. McClean:

> Q. Do you agree that overall, the evidence regarding occupational factors for cancers of the oral cavity and pharynx remains inconclusive, and this is for several reasons: The lack of consistency in definition or grouping of cancer sites hampered the comparison between the studies?
> A. Well, I don't think they – that's the typical type of statement that you find at the end of a paper where they don't want to imply that there's no further research needed on the subject.
> Q. Do you agree with that statement?
> A. The additional research always adds to the weight of evidence on a particular subject.
> Q. Do you agree that cohort studies also typically lack data on potential confounding factors such as smoking and alcohol drinking, the major risk factors for oropharyngeal cancers?
> A. Those studies differ greatly. Some studies will have that information and other studies won't. But in the studies -- they were making the comment about those studies that they were looking at.

These are two of the three points on which Illinois Central contends it was prevented from interrogating Dr. McClean. However, the record makes clear that Illinois Central was able to ask these questions in the presence of the jury and without objection.[28]

Illinois Central did not make an offer of proof regarding the Paget-Bailly article, as required by Rule 103(a)(2).[29] In its brief, Illinois Central refers us to a portion of Dr.

---

[28] We have not been cited to an instance where Illinois Central attempted to admit the desired testimony via another witness and was prevented from doing so.

[29] Tenn. R. Evid. 103 states:

> (a) Effect of Erroneous Ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . .

> (2) Offer of Proof. In case the ruling is one excluding evidence, the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context.

McClean's deposition of in support of its position that the exclusion of testimony about the Paget-Bailly article affected the outcome of the trial. In our discretion, we have considered the deposition testimony in the context of examining potential prejudice suffered by Illinois Central. In Dr. McClean's deposition, he explained:

> [I]f you don't control for HPV and you don't account for it, you may actually decrease your ability to see an effect of another agent. So the true effect may actually be larger than what you observe, because there are people in your population who got the disease because of HPV and you're not accounting for it. … So it's possible that in studies that don't control for HPV in head and neck cancer, that they're underestimating the effect of other agents just because some of the cases in their population actually got the disease for another reason, in this case HPV.

At trial, he testified that, "If we don't control for HPV, and our earlier studies didn't control for HPV, we would still see an effect of tobacco, but it's when we control for HPV, we see an even stronger affect [sic] of tobacco." Dr. McClean's trial testimony is not inconsistent with his deposition testimony, and, therefore, we conclude that further testimony from Dr. McClean would not have contradicted that which had already been heard by the jury.

Considering the evidence as a whole, the court did not exclude evidence that would have changed the outcome of the trial.

In addition, Illinois Central asserts that it "should have been permitted to delve further" into Dr. Kelsey's opinion by exploring the Paget-Bailly article, which Defendant asserts would have shown that Dr. Kelsey "improperly extrapolated data regarding carcinogenity from studies of cancer sites distinct from the oropharynx." Dr. Kelsey testified by video deposition, and no rulings were made by the trial court at any point during the playing of the deposition.[30] Because Illinois Central refers us to no rulings by the trial court during Dr. Kelsey's testimony, this issue is waived.[31]

---

[30] Prior to the trial resuming on the morning of April 15, 2013, plaintiff's counsel remarked to the court – and Defense counsel agreed – that the parties had decided to "play the Kelsey deposition…without proposing our objections to the Court for resolution. … In other words, there were some objections we were going to submit on Kelsey, but after consulting with each other we decided to just go ahead and play it as is, upon agreed editing."

[31] The appellants bear the burden of making citations in their brief to appropriate authorities and to reference the record to support their argument on appeal. Tenn. R.App. P. 27(a)(7)(A). In *Bean v. Bean*, 40 S.W.3d 52, 55-56 (Tenn. Ct. App. 2000), this court stated that "the failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief as required by Rule 27(a)(7) constitutes a waiver of the issue." *See also* Rule 6(b) of the Rules of the Court of Appeals

### *4. Application of Tenn. R. Evid. 613*[32]

Illinois Central asserts in its reply brief that "[c]ontradictions by Dr. Westra are in his own works clearly presented in the record for purposes of the appeal, but Defendant was not permitted to present these essential shortcomings in his testimony to the jury because the trial court once again improperly applied Rule 618 and 703 to hamstring its attempts to impeach with his inconsistent statements pursuant to Rule 613." Illinois Central quotes extensive excerpts from the testimony of Dr. Westra in its brief; none of the objections or rulings in the excerpted testimony is grounded in Rule 703. As we have earlier held that the court's application of Rule 618[33] was proper and as we perceive no violations of that Rule in the testimony we have reviewed, we therefore will respond to the remaining two objections appearing in the excerpts we have been provided: one to lack of foundation and one to the form of the question.

With respect to the lack of foundation objection, the portion of transcript that was reproduced in the brief demonstrates that counsel was able to question Dr. Westra with reference to his findings published in *The New England Journal of Medicine* that having any of the 37 types of HPV increase one's likelihood of having oropharyngeal cancer by 12 times. The record shows that Defense counsel was able to ask Dr. Westra about his prior writings[34] because the trial court's rulings during this particular line of questioning

---

of Tennessee.

[32] Tenn. R. Evid. 613 reads as follows:

> (a) Examining Witness Concerning Prior Statement. In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel.

> (b) Extrinsic Evidence of Prior Inconsistent Statement of Witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 803(1.2).

> (c) Opinions. A prior statement in opinion form is admissible to impeach testimony.

[33] See discussion at Section II.C.2, *supra*.

[34] During the cross examination of Dr. Westra, he was asked the following question by Illinois Central:

> Q.  Okay. Doctor, now that you've had an opportunity to review ["Case Control Study of Human Papillomavirus and Oropharyngeal Cancer" co-authored by Dr. Westra],

either overruled the objection or required counsel to rephrase the question.

As to the objection to the form of the question, Illinois Central asserts that it was unable to compare Dr. Westra's opinion that a tumor originally HPV positive will always recur as similarly HPV positive with his "own prior writings that undermin[e] this assertion." However, after Plaintiff's objection was sustained, the transcript shows that Defendant rephrased the question and elicited the concession he sought from Dr. Westra.[35]

Further, we note that one article referenced in the portion of the transcript to which

do you agree that oral infection with any of the 37 types of HPV increases the risk of oropharyngeal cancer over 12 times?
A.     Yes. That paper isn't talking about causation, but it's talking about risk.
Q.     Right.
A.     Yes, oral cancer infection, and many, many people have oral HPV infections, does increase the risk.

[35] The cross examination of Dr. Westra on this point occurred as follows:

Q.     Are you familiar with an article where you coauthored and – titled Presence of HPV DNA in Convalescent Salivary Rinses and Adverse Prognostic Marker in Head and Neck Squamous Cell Carcinoma?
A.     Vaguely.
Q.     Is that a reliable authority, your article?
A.     It was a good study.
       MR. PETERS: Can I pass that up?
Q.     Sir, in that case, also there were four – strike that. Sir, does that refresh you as to whether or not you also saw another situation where a tumor that was originally HPV positive was not when it recurred?

[Objection to the question was raised and discussed; the court sustained the objection as to the form of the question.]

Q.     Sir, do you recollect whether there are any other incidences, other than the one you've already talked about, where an initial tumor was HPV positive, and then the second tumor tested negative?
A.     Regarding this paper? I don't – you see, the thing is, patients with HPV positive tumors doesn't mean that they cannot develop an HPV negative tumor.
Q.     That's –
A.     Is that what you're asking me?
Q.     That's where I wanted to start with. Even though the 2008 tumor is HPV negative, that doesn't tell us whether or not the 1989 cancer was HPV negative or not, correct?
A.     I concede that, right.
Q.     Thank you.

24

Illinois Central cites, "The Role of Human Papillomavirus Infection in Head and Neck Cancers" by S. Syrjanen appearing in the *Annals of Oncology*,[36] was not written or co-authored by Dr. Westra. Thus an attempt to impeach him under Rule 613 would not have been appropriate.

Considering the entire cross examination of Dr. Westra, we conclude that Illinois Central was able to examine the witness on the topics to which objections were sustained. After many of the trial court's rulings, counsel for Illinois Central was able to rephrase the question and proceed with the interrogation of the witness. These rulings, viewed in context, were not an abuse of discretion.

### 5. Application of Tenn. R. Evid. 803(8)

Duane Amato was called by Illinois Central to testify regarding an asbestos study performed on railroad shops in West Virginia in 1952. In the course of his testimony, Mrs. Russell's counsel objected to continued testimony about this study, stating:

> This is the so-called Hallie study. It's pure hearsay. And even -- and even if it was offered for the purpose -- even if it could be disclosed to the jury, there will be no evidence whatsoever that Illinois Central ever knew of this study. That there – there's just no connection between the study and Illinois Central. And it violates Rule 703.

In response to the objection, Defendant elicited the following testimony from Mr. Amato:

> Q. Sir, you talked about this examination of these Huntington shops of the C&O. Can you tell me what entity did that examination?
> A. Yes. The State of West Virginia.
> Q. Do you recall what department of the State of West Virginia?
> A. Department of Labor.
> Q. And does that department have a duty as part of its function is [sic] to report on its findings to the public and people who are interested in the topics?
> A. I'm not sure that they have a responsibility to report to the general public. But they do have responsibility certainly as the Department of Labor to try and provide a healthy safe workplace.
> Q. Thank you. Can you tell me, sir, just based upon -- in talking about the '50s -- what that report would have added to the state of their

---

[36] S. Syrjanen, Symposium Article, *The Role of Human Papillomavirus Infection in Head and Neck Cancers,* ANN. OF ONCOLOGY. 2010; 21 (Supplement 7): vii243-vii245.

knowledge concerning asbestos through evidence?

MR. GAVIN: Same objection, Your Honor.  Lack of foundation.

The objection was sustained.

The Advisory Commission's comment to Tenn. R. Evid. 803(8) states that this "rule admits records of public officials acting under an official duty to report accurately" as an exception to the rules prohibiting the admission of hearsay. Rule 803(8) reads:

> **Public Records and Reports.**  Unless the source of information or the method or circumstances of preparation indicate a lack of trustworthiness, records, reports, statements, or data compilations in any form of public offices or agencies setting forth the activities of the office or agency or matters observed pursuant to a duty imposed by law as to which matters there was a duty to report, excluding however, matters observed by police officers and other law enforcement personnel.

This Rule necessarily requires that the party seeking introduction of the record or report establish that the record or report is from a public office or agency acting under a duty to create the report before it can be admitted into evidence and its contents discussed.  The witness did not affirmatively testify that the report was prepared by the West Virginia Department of Labor pursuant to a duty imposed by law, as required by Rule 803(8)'s exception; the objection was properly sustained.

Illinois Central also contends that it was prevented from exploring the findings of the National Cancer Institute ("NCI") with Dr. McClean due to the trial court's misapplication of Rule 803(8).  The ruling to which we are cited occurred when counsel appeared to be laying the foundation to attempt to impeach Dr. McClean under Rule 618 and had asked if he found the NCI and a parallel organization, the IARC, to be reliable. The witness agreed that the organizations were reliable; when asked if he found them authoritative, Dr. McClean answered, "Well, I particularly -- I mean, I've considered more of the IARC group than the National Cancer Institute because IARC – IARC's monograph program is a bit different than anything that NCI produces." Defense counsel proceeded to ask if either of those organizations had identified asbestos, diesel exhaust or environmental tobacco smoke as a cause of oropharyngeal cancer, and the court sustained Plaintiff's objection to lack of foundation.

The witness stated that he found the IARC research authoritative, but did not state the same as to the NCI. The specific ruling at issue sustained an objection based on lack of foundation and did not prevent defense counsel from attempting to establish that the NCI's findings were also authoritative or that the records were created by a public agency

26

acting under a duty to report in another way or through another witness. Defense counsel proceeded to discuss the IARC's research findings and failed to make an offer of proof as to what testimony would be elicited from Dr. McClean on the topic of NCI's research findings. As the proper foundation was not laid to admit evidence about the NCI's findings under Rule 803(8) or Rule 618, this ruling was not an abuse of discretion.

In summary, the trial in this case lasted two weeks, and the jury heard evidence through the testimony of 29 witnesses. Considering the entirety of the proof, the multitude of evidentiary rulings in context, and the offers of proof, the evidence that was excluded did not affect the outcome of the trial such as to require that the judgment to be set aside.

### D. Statute of Limitations

Illinois Central asserts that the three-year statute of limitations governing FELA actions should have barred Plaintiff's claim and that Plaintiff did not establish that Mr. Russell acted with reasonable diligence in investigating potential causes of his injury.[37]

When making a claim under FELA, a plaintiff must file suit within the three-year statute of limitations. 45 U.S.C. § 56. As this Court has stated:

> The test for statute of limitations purposes is not necessarily whether a formal diagnosis has occurred. The statute begins to run as soon as the injured party is "in possession of the critical facts" necessary to discover that a potential cause of action exists—namely, "that he has been hurt and who has inflicted the injury." *United States v. Kubrick*, 444 U.S. 111, 122, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). … [A]n affirmative duty to investigate one's symptoms and their causes arises when a claimant "should have known" that such an investigation was needed; in these cases, the statute of limitations will "start[ ] to run when a reasonable person would know enough to prompt a deeper inquiry[.]" *Nemmers v. United States*, 795 F.2d 628, 631 (7th Cir.1986).

---

[37] At the summary judgment stage, the trial court found that a disputed fact existed as to when the cause of action accrued and therefore the jury should determine when the Plaintiff knew or should have known the essential facts of injury and its potential cause. At trial, Illinois Central moved for a directed verdict on the basis that the statute of limitations barred the action at the close of Plaintiff's proof; it renewed the motion after closing its proof and again after Plaintiff's rebuttal testimony. One of the questions the jury was asked to determine was, "Do you find that Plaintiff's Complaint is barred by the three-year statute of limitations?," to which the jury responded "No." After trial, Illinois Central moved the court pursuant to Tenn. R. Civ. P. 50.02 for judgment in accordance with its motion for directed verdict; the court denied the motion.

*Hensley v. CSX Transp., Inc.*, 278 S.W.3d 282, 288 (Tenn. Ct. App. 2008). Thus, we examine the record for evidence of not only when Mr. Russell was first diagnosed with the subject illnesses but also when he first knew he was exposed to carcinogens at his workplace. In order words, when did Mr. Russell know — or should have known — that (1) that he had these illnesses, and (2) that they were caused by Illinois Central. In reviewing the court's ruling on Illinois Central's Tenn. R. Civ. P. 50.02 motion, we are mindful of the ruling from *Holmes v. Wilson*, 551 S.W.2d 682 (Tenn. 1977), which requires that we take the strongest legitimate view of the evidence in favor of Mrs. Russell, the opponent of the motion.[38]

Mrs. Russell testified that her husband's doctors never told her or her husband what caused his 1989 throat cancer and that his doctors told him he was cured of cancer in 1995. Fellow employees of Illinois Central testified that the Defendant never told or trained them about the hazards of asbestos or informed them that it could cause cancer. As established in section B, above, when reviewing a jury verdict approved by the trial court, we take the strongest legitimate view of all the evidence to uphold the verdict, assume the truth of all that tends to support it, discard all evidence to the contrary, and allow all reasonable inferences to sustain the verdict. *Moore*, 628 S.W.2d at 433; *Reynolds*, 887 S.W.2d at 823. Drawing all reasonable inferences in favor of Mrs. Russell and disregarding all evidence favorable to Illinois Central that the jury was not required to believe, there was material evidence to support the jury's determination that the action was not barred by the statute of limitations. The trial court did not err in refusing to grant Illinois Central's motion for judgment in accordance with its motion for directed verdict or for a new trial on this basis.

### E. Exclusion of the 1995 Release

In 1995, Mr. Russell entered into an agreement with Illinois Central in which he received $3,500 to settle a hearing loss claim; the parties executed a one-and-a-half page release. The pertinent portions read as follows:

---

[38] In *Holmes*, our Supreme Court held:

> A post-trial motion for the entry of judgment in accordance with a motion for a directed verdict made during the trial must be gauged by the usual rules relating to directed verdicts which require that the trial judge, and the appellate courts, allow all reasonable inference in his or her favor, discard all countervailing evidence, and deny the motion where there is any doubt as to the conclusions to be drawn from the whole evidence.

552 S.W.2d at 685.

RELEASE

FOR AND IN sole consideration of THREE THOUSAND FIVE HUNDRED DOLLARS AND N0/100 (3,500.00), in hand paid, the receipt and sufficiency of which is hereby acknowledged, I, the undersigned, MILFORD R. RUSSELL, JR., do hereby fully and completely release, discharge, and acquit Illinois Central Gulf Railroad, Illinois Central Railroad Company, their predecessors, successors, employees, agents, insurers, officers and assigns, and all other persons, firms or corporations liable or who may be claimed to be liable from anything heretofore occurring without limiting the foregoing on account of all injuries known and unknown, both to persons and property, which have developed or which may develop in the future, from any and all injuries and/or diseases to my ears, inner ears or head resulting in an impairment of my ability to hear which has resulted or which may in the future result from my exposure to noise and/or trauma while working as a railroad employee.

This release specifically excludes any personal injury claim or lien pending against Illinois Central Gulf Railroad, or Illinois Central Railroad Company, other than for occupational, disease-type illness, or illnesses, to wit, including but not limited to, asbestosis, lead, dust, sand, diesel fumes, paint, PCB, Dioxin, or other toxic or noxious chemical exposure, which claims are specifically released by this document.[39]

Mrs. Russell filed a motion *in limine* to exclude evidence of the release based on the court's prior ruling on Illinois Central's motion for summary judgment that, as a matter of law, the release was not sufficiently specific to release Illinois Central from the

---

[39] Based on this paragraph, Illinois Central filed a motion for summary judgment on the ground that Plaintiff's claim was barred. The trial court denied the motion, holding that the 1995 release "did not release Illinois Central from the claims presently asserted by Plaintiff in this lawsuit." Specifically, the court noted, "I don't think the release was specific as to the quantities or location and duration that the plaintiff may have been exposed to" and that the second paragraph consisted of "boilerplate language" that was "not sufficient to constitute a valid release." Illinois Central asserts on appeal that granting of the motion *in limine* which excluded the release from evidence at trial, not the denial of summary judgment, was error. Illinois Central did not make an offer of proof or otherwise introduce the release at trial. Given the unique procedural posture in which this issue is presented, it is appropriate that we address as a matter of law the validity of the release to the cancer claim at issue in determining whether the trial court erred in excluding it. Tenn. R. Evid. 103(a)(2) requires an offer of proof when a party contends the court's ruling excluding evidence is error, unless the substance of the evidence and the specific evidentiary basis supporting admission are apparent from the context; however, as we determine whether the release operated to release Illinois Central from the claims at issue, the purpose of the proposed admission and the basis supporting admission is readily apparent from the record.

claims at issue. Defense counsel stated at the hearing on the motion *in limine*, "It's still our intent to let the jury read the release and decide whether or not it believes that that released his cause of action when he settled this case." The court granted the motion. Illinois Central asserts that a new trial is warranted because the "1995 release, by its own terms, was relevant to the decedent's duty to investigate potential causes of his 1989 oropharyngeal cancer diagnosis" for purposes of determining when the statute of limitations began to run.

We review the trial court's decision to exclude the release under an abuse of discretion standard. *Banks*, 271 S.W.3d at 116. As this Court has recently held, the "validity of a release under FELA raises a federal question to be determined by federal law." *Blackmon v. Illinois Cent. R.R. Co.*, W2013-01605-COA-R3CV, 2014 WL 2069300, at *3 (Tenn. Ct. App. May 16, 2014 (citing *Dice v. Akron, C. & Y. R.R. Co.*, 243 U.S. 359, 361 (1952)). FELA allows the release of a claim when it is "a means of compromising a claimed liability." *Callen v. Pennsylvania Railroad Co.*, 332 U.S. 625, 631 (1948).[40] The Sixth Circuit Court of Appeals concluded that such releases are valid to the extent that they settle a known claim for a specific injury. *Babbit v. Norfolk & Western Ry. Co.*, 104 F.3d 89 (6th Cir. 1997).[41] Taking a broader approach to settlement of FELA claims, the Third Circuit Court of Appeals has held that releases are valid when they pertain to specific injuries and also to future injuries arising out of risks known to the parties at the time the release is signed. *Wicker v. Consolidated Rail Corp.*, 142 F.3d 690, 701 (3d Cir. 1998).[42] Acknowledging the ease of including boilerplate language in these releases, that court stated that "where a release merely details a laundry list of diseases or hazards, the employee may attack that release as boiler plate, not reflecting

---

[40] In *Callen*, the U.S. Supreme Court examined 45 U.S.C. § 55, which prohibits a common carrier from forming contracts, rules, regulations, or devices to exempt itself from liability under FELA, and held that a release executed between an employer and employee with respect to a FELA claim is not void when it "is a means of compromising a claimed liability. . . Where controversies exist as to whether there is a liability, and if so, for how much, Congress has not said that parties may not settle their claims without litigation." *Callen*, 322 U.S. at 631.

[41] In *Babbitt*, the Sixth Circuit Court of Appeals held that general release claims executed as part of a railroad's early retirement program were not valid under FELA; instead, "[t]o be valid, a release must reflect a bargained-for settlement of a known claim for a specific injury, as contrasted with an attempt to extinguish potential future claims the employee might have arising from injuries known or unknown by him." *Babbit*, 104 F.3d at 93.

[42] In *Wicker*, the Third Circuit Court of Appeals examined releases that were negotiated as part of the settlement of an existing FELA claim and noted that a release that "spells out the quantity, location and duration of potential risks to which the employee has been exposed–for example toxic exposure–allowing the employee to make a reasoned decision whether to release the employer from liability for future injuries of specifically known risks does not violate [45 U.S.C. § 55]." *Wicker*, 142 F.3d at 701.

30

his or her intent." *Wicker*, 142 F.3d at 701.

We agree with the trial court that the release executed by Mr. Russell was not sufficiently specific to release the cancer claims at issue. The language in the second paragraph of the release is boilerplate; it contains a laundry list of chemicals and references only one disease by name: asbestosis. Under either the *Babbitt* or *Wicker* approach, both of which were referenced by the court in its ruling at the hearing, this language lacks sufficient specificity and fails to reflect an informed intent of Mr. Russell to release a future claim for cancer.

Illinois Central contends that "the 1995 release was relevant and admissible evidence regarding the decedent's knowledge and duty to investigate potential causes of his 1989 cancer and 2007 recurrence" and "informed Mr. Russell of the potential causes of action brought against Illinois Central approximately fifteen years later." Illinois Central in essence argues that, by signing the release in 1995, Mr. Russell was on notice of a disease that was diagnosed more than a decade later and ultimately caused his death. Reviewing the facts presented in the record, we note that Mrs. Russell testified that neither she nor Mr. Russell was told the cause of Mr. Russell's 1989 cancer, which was successfully treated. Further, twelve years elapsed between the execution of the release and the recurrence of his cancer. Notably, the word "cancer" does not appear on the release he signed. What does appear are a series of generic hazards rather than the specific risks or a chronicle of the scope and duration of risks faced by Mr. Russell during his employment. This language is not sufficient to constitute notice that the 2007 cancer was a result of his workplace exposures. *See Blackmon*,[43] 2014 WL 2069300, at *14; *Wicker*, 142 F.3d at 701-702.

Further, no evidence has been offered to show that Mr. Russell was aware of the risks of developing cancer as a result of his workplace exposures in 1995; we would have to assume many facts not contained in the record to reach the conclusion Illinois Central desires. It was incumbent on Illinois Central to make an offer of proof to establish such awareness; the release itself is not sufficient to demonstrate, conclusively, what Mr. Russell knew or understood at the time he signed it. *See Blackmon*, 2014 WL 2069300, at *15. We are unable to discern how Illinois Central would have established that Mr. Russell was made aware that occupational exposure could have caused his cancer and imposed a duty to investigate; thus we have no basis to determine that the court erred. *See Dossett v. City of Kingsport*, 258 S.W.3d 139, 145 (Tenn. Ct. App. 2007) (citing Tenn. R.

---

[43] The *Blackmon* case involved an appeal from summary judgment in which we held that a FELA release was "not . . . sufficient to demonstrate, conclusively, that [the decedent] understood that he was at risk of developing mesothelioma, or, in other words, that it was a risk known to him, at the time the release was signed" despite the fact that the release contained extensive boilerplate language that listed mesothelioma, the disease causing the decedent's death. *Blackmon*, 2014 WL 2069300, at *15.

Evid. 103(a)(2); *State v. Goad*, 707 S.W.2d 846, 853 (Tenn. 1986); *Harwell v. Walton*, 820 S.W.2d 116, 118 (Tenn. Ct. App. 1991)).

Because the 1995 release did not operate to release the claims in this case, we agree with the trial court that evidence of it was irrelevant.[44] The court did not abuse its discretion in granting the motion *in limine* and excluding the release from the jury's consideration.

## F.  Exclusion of non-railroad industry smoking policies

Mrs. Russell's motion *in limine* also sought to exclude evidence of non-railroad industries' smoking policies because they were not relevant. In its oral ruling on that portion of the motion, the court found such policies irrelevant:

> [W]hat we're trying to find out is what a reasonable railroad would do in terms of its policies.  . . . So to the extent you're talking about other industries, you're mixing apples and oranges.  This jury needs to know and this Court needs to know what a reasonable railroad would do, not what a tile manufacturer would do, so I'm going to grant the motion to the extent that it goes outside railway or railroad industries.

While this issue was raised and ruled upon as part of Plaintiff's motion *in limine*, in its brief, Illinois Central cites us to a sidebar conference where Defense counsel discussed his plan to examine Dr. Vance regarding a surgeon general's report from 1986 that states that "3 percent of the American workforce was employed in a smoke-free environment."  We have been cited to no other non-railroad industries' smoking policies, proof, or offer of proof in this regard.  Consequently, we address this issue in the context of counsel's statements at the sidebar conference.

Illinois Central devotes three sentences in its brief to its argument that the trial court erred in excluding evidence of non-railroad industries' smoking policies. It argues that the policies were "relevant to Defendant's liability or foreseeability defenses" and that the ruling prevented Illinois Central from discussing smoking policies in an historical

---

[44] Tenn. R. Evid. 401 states: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  The Advisory Committee notes to Rule 401 provide that "[t]o be relevant, evidence must tend to prove a material issue."

Tenn. R. Evid 402 states: "All relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible."

and social context during the cross examination of Dr. Vance.  Having reviewed the transcript, we fail to see how the one statement it sought to introduce "was relevant to Defendant's liability or foreseeability defenses."  The duty at issue was Illinois Central's duty to maintain a safe work environment; given the record we have been presented, evidence of other industries' smoking policies was irrelevant, and the exclusion of such evidence was not an abuse of discretion.[45]

## G. Violations of Pretrial Rulings on Motions *in Limine*.

Prior to trial, Mrs. Russell disclosed to Illinois Central the portions of the video depositions of Thomas Wright and Wayne Herron, witnesses who were former employees of Illinois Central, which she intended to use at trial.  Counsel for both parties conferred about the portions of the depositions each intended to use.  The trial court heard and ruled upon objections pertaining to both depositions; Plaintiff's counsel edited the depositions and sent a listing of the portions of each that would be used to counsel for Illinois Central.  In the course of playing the depositions for the jury, portions which had previously been ruled inadmissible were played.  Illinois Central moved for a mistrial during Mr. Herron's testimony and immediately following the playing of Mr. Wright's deposition; these motions were denied. Illinois Central contends that it was unfairly prejudiced by the testimony and that a mistrial or new trial should have been granted.

The decision to grant or deny a motion for a mistrial is within the trial court's sound discretion. *W. End Recreation, Inc. v. Hodge*, 776 S.W.2d 101, 104 (Tenn. Ct. App. 1989).  The court's action will not be reversed unless the court abuses that discretion. *State v. Jefferson*, 529 S.W.2d 674, 682 (Tenn. 1975).

Illinois Central contends it was unfairly prejudiced by the jury hearing Thomas Wright's testimony relating to a cancer claim he had against Illinois Central and to what he would have done had he been informed of the danger of asbestos. The entirety of the testimony pertaining to Mr. Wright's cancer claim is as follows:

Q.     Now, Tom, you have cancer yourself, don't you?

---

[45]    The trial court's statement at the motion *in limine* hearing was reflected in the following jury instruction, which is not at issue on appeal:

The Defendant's duty of care is measured by what is reasonably foreseeable under like circumstances.  The test of foreseeability is whether in light of all the circumstances, a reasonably prudent person -- a reasonably prudent railroad, I should say, should or could reasonably have anticipated that some injury was likely to result to an employee under the circumstances at said time and place from any negligent act of the Defendant.

A.    Yes.

Q.    And that's part of the claim that you're making against Illinois Central Railroad Company?

A.    Yes.

Evidence related to Mr. Wright's cancer was addressed in Defendant's motions *in limine* to exclude "alleged asbestos related illness by former employees of Defendant." The court ruled that evidence of other asbestos-related claims against Illinois Central would be admitted to show notice "unless the parties reached a stipulation that there is notice." Prior to playing the deposition, the court reviewed all objections raised by Illinois Central; the portion of the deposition quoted above pertaining to Mr. Wright's cancer was not objected to by Illinois Central. After Mr. Wright's deposition was played, Defendant moved for a mistrial; the motion was overruled.[46]

---

[46] Pertinent excerpts from the arguments and the court's ruling on the motion follows:

> MS. REIFERS: Your Honor, the Defendant moves for a mistrial based upon the Motion in Limine not to admit asbestos-related injuries of other employees. At the time the Court overruled the Motion and indicated if the injury was related to notice it could come in. We did not realize Mr. Gavin … was going to play the portion of the transcript that this employee indicated that he had cancer of whatever kind and the deposition was taken in 2009. That was very prejudicial to the Defendant. . . .
> ***
> THE COURT: Well, I understand. That's the only word -- if I had known earlier, that way I would have kept out the fact that he has a claim. That's no big deal, but almost a similar claim. But when you saw that, Ms. Reifers, if you knew that was coming, why not make it a contemporaneous objection? Or make an objection before you got to that point if you knew it was coming?
> MS. REIFERS: Your Honor, if I had jumped up in the middle of this playing, it would have drawn even more attention.
> THE COURT: I understand that. But you knew what the designations were. That was not Xed out, and I assume you were reading along with the -- on your own transcript what was supposed to be out to double check the videographer's record. If you knew that was coming up, then why wouldn't you jump up before then?
> MS. REIFERS: I didn't realize it before it was played. I did not. And I was just looking at the Court's ruling. I knew that the Court had ruled that asbestos-related injuries that could provide notice could come in.
> THE COURT: But we -- but wasn't yesterday afternoon I devoted to sanitizing the transcript so that objectionable materials would not come in?
> MS. REIFERS: There was some time devoted to that, yes, sir.
> MR. GAVIN: I might add to that Your Honor, that once we finished talking with the Court on the bench that I asked Mr. Kurz to step over and speak with me directly about each transcript to make sure that we had it right. And we went through each transcript to make sure that the ultimate result complied with what your rulings were yesterday. And we did that for just this purpose. And I didn't hear a word about it.
> MS. REIFERS: Your Honor, there's no doubt this jury has been poisoned. They're left

34

Upon our review, we fail to see how the testimony quoted above violated the order on the motion *in limine*. Counsel for Plaintiff, in his arguments to the court on this issue, asserted that he had asked the question to address potential bias of the witness. Viewed in context, the admission of the question and answer were not prejudicial error that affected the outcome of the trial. Further, we note that Illinois Central did not contemporaneously object to this testimony, as required by Tenn. R. Evid 103(a)(1).

With regard to the testimony of Wayne Herron, the trial court ruled that the portion of the deposition pertaining to Mr. Herron's belief that asbestos was present in the welding room, which later became the dining room, at the Trigg Avenue Shop was speculative and thus inadmissible. The court had also ruled that the parties should "take out anything that's referencing [the Johns Manville] company," a brief reference to which existed in Mr. Herron's video deposition testimony. In spite of these rulings, the inadmissible testimony was still played to the jury. In ruling on Defendant's motion for a new trial, the court found the errors harmless.

Illinois Central called two of its expert witnesses, Mr. Amato and another industrial hygienist, Mr. Larry Luikonen, to testify, *inter alia*, regarding what types of asbestos products Mr. Russell may have come in contact with in his workplace. Both Mr. Amato and Mr. Luikonen testified on the basis of statements made by Illinois Central employees that there was asbestos in Illinois Central's maintenance shops; this was similar to Mr. Herron's testimony that there was asbestos in the Trigg Avenue shop. Further, the presence of asbestos and Illinois Central's employees' knowledge of its presence was alluded to in the Defendant's interrogatories which were entered into evidence at trial. In light of the fact that evidence about the presence of asbestos was presented to the jury by Illinois Central outside of the deposition testimony of Mr. Herron, we fail to see how the Defendant was unfairly prejudiced by the portion of Mr. Herron's testimony to which it objects.

With respect to Mr. Herron's testimony pertaining to Johns Manville, we do not see, and Illinois Central does not assert in its brief, how the jury would have been unfairly prejudiced by hearing one sentence mentioning the name of the potential manufacturer of asbestos found in replacement gaskets. In reviewing the arguments of counsel before the court at trial and in post-trial motions as well as in the briefs on these points, we agree with the court that the errors relative to the Herron deposition were harmless. Defendant was not prejudiced by the reference to Johns Manville or the reference to the presence of

---

with the impression that this man who's represented by Mr. Gavin in an asbestos-related lawsuit has cancer, and they're going to assume it's the same kind of cancer. I mean, how do we ever overcome that now?

THE COURT: Well, you all knew what was coming, and that's the problem. We've done all of this and this comes in. . . .

asbestos in the Trigg Avenue shop in Mr. Herron's testimony. We find no error in the trial court's denial of a mistrial on the basis this testimony.

According to Rule 36(b) of the Tennessee Rules of Appellate Procedure, a judgment "shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." *West End Recreation, Inc.*, 776 S.W.2d at 106. (citing *Blackburn v. Murphy*, 737 S.W.2d 529, 533 (Tenn. 1987)). In examining the effect of these portions of testimony in light of the whole record, we are convinced that the testimony did not substantially affect the outcome of the trial. We find no error in the trial court's rulings pertaining to the testimony of Mr. Herron and Mr. Wright.[47]

## H. Failure to strike or to provide curative instructions concerning testimony of Drs. McClean and Kelsey

Illinois Central contends that "the trial court's allowance of the objectionable testimony by Dr. McClean and Dr. Kelsey . . . regarding an unpublished, unreliable study in which they had taken part regarding asbestos and pharyngeal cancer . . . provided the jury with misleading evidence and an improper basis to reach its verdict." Citing the following trial testimony from Dr. McClean's re-direct examination, the Defendant asserts it was prejudiced by the court's failure to strike or provide a curative instruction to the jury:

Q.    Before you even got into this case, did you have an understanding of the literature, generally speaking?
A.    Yes, generally.
Q.    And has your group studied asbestos and its work in head and neck cancer?
A.    We recently have. The work is not published yet, but we've looked at it.
Q.    Did you, in your work in this case, consider what you've done in your work to date, even though it hasn't been studied -- I mean published? I'm sorry.
A.    No.
Q.    Why not?
A.    Well, it hasn't been peer reviewed yet. For the asbestos paper, we've produced an abstract that we've sent to a scientific conference. So we go to

---

[47] Defendant also asserts that "the trial court's failure to provide a curative instruction on these issues was reversible error requiring a new trial," but we do not find, nor are we cited to, a request for such an instruction to the jury. In any event, the testimony objected to is not of such a magnitude as to call for a curative instruction.

36

conferences to present our latest work, sort of hot off the presses. And -- but it's not really peer reviewed. If it gets accepted to be delivered at a conference, that -- even though it does get reviewed, they're just reviewing the abstract, which is a very brief description of the work. And so we don't consider that to be a peer-reviewed process. We're now developing a paper that will be submitted to a journal for publication, and that will be subjected to multiple peers reviewing the work. We'll have to – we'll get comments back. We'll have to revise it, resubmit it. There's a whole process, and then it gets into the published literature. So that's a distinction that we make in published versus unpublished work.

MR. PETERS: Your Honor, I have an objection. May we approach the bench? … Mr. Gavin has elicited testimony on information that's not published and that this very witness finds unreliable in rendering his opinion. Yet, this is now before the jury. That's improper. And I would ask the Court instruct the jury that they completely disregard any reference to unpublished literature or unpublished studies that this man has done.

THE COURT: Mr. Gavin.

MR. GAVIN: On Cross-Examination, Mr. Peters elicited from Dr. McLean [sic] that he had studied asbestos, and these are just follow-up questions to that. And I think Dr. McLean [sic] has made it -- been very forthright that he did not even consider that because, as a matter of practice, he doesn't consider --

THE COURT: So why are we still talking about it then if he didn't consider it and it's not been peer reviewed and all we've been talking about is unpublished, as well?

MR. GAVIN: Well, because -- because quite honestly, I would think that an expert could consider work that they've done but yet not published. Now, he's not willing to do so, so I guess we just move on.

THE COURT: All right. I sustain the objection.

MR. PETERS: Can I get that stricken from the record?

THE COURT: No, sir.

In the foregoing, we fail to see any objectionable testimony or testimony that calls for a curative instruction. The witness testified that he did not rely on the study. While Dr. McClean testified that his research group had studied asbestos and head and neck cancer, he disclaimed reliance on the particular study referenced by Illinois Central because it had not yet been peer reviewed or published. The trial court had discretion to determine whether a limiting or curative instruction was needed, and we find no abuse of its discretion.

We have likewise reviewed the testimony of Dr. Kelsey regarding the unpublished

37

study cited by Defendant, as well as that cited by Plaintiff.  The study was first addressed by Illinois Central during its cross examination of the witness, and the questions on redirect addressed the testimony elicited on cross examination.  We see no reason for a curative instruction.[48]

## I.  Defendant's Motion for Set-Off[49]

---

[48] The questions elicited during Illinois Central's cross examination of Dr. Kelsey are as follows:

Q.      Now, on these studies of asbestos and pharyngeal cancer, or this relationship you talked about, none of those studies with respect to asbestos and pharyngeal cancer have controlled for [tobacco, alcohol, and HPV] in the published literature?
A.      Right, none except for the work that we've done looking at our case control study, and when we look, we see association; we see risk.
Q.      There's nothing published there; correct?
A.      We actually have taken a look at that.  We have a poster in the upcoming APCR around this issue, and it's an interesting issue.  We, when we control for that, see it.  We have submitted the paper; we haven't – it's not published.
Q.      Anyway, at least as far as the published literature is concerned, up to today's date, no study, no published study, has controlled for all three factors; correct?
A.      I think that is true.  But I would point out that the relationship between pharyngeal cancer and HPV is an emerging one, and in the old literature there's probably very little confounding because HPV was not prevalent in that time period.  So the probability for confounding in the older literature is probably less.

The redirect testimony elicited by Plaintiff on the unpublished study consisted of the following exchange:

Q.      Now, have you studied in your work and research the occurrence of pharyngeal cancer in people exposed to asbestos?
A.      Yes.
Q.      And is that work and research ongoing?
A.      Yes.

Further, no request for a curative instruction or objection was lodged during the testimony of Dr. Kelsey, as we have previously noted.  See footnote 30 and related text.

[49] Illinois Central initially filed a motion to offset the judgment as part of a motion *in limine*.  After the jury verdict was rendered but before final judgment was entered, Defendant filed a motion for offset; the motion was not ruled upon prior to entry of judgment in accordance with the verdict.  After the entry of judgment, Defendant moved to alter or amend the judgment in accordance with Tenn. R. Civ. P. 59.04, the first ground of which sought to offset the judgment in the amount of $919,315.  The court granted that motion and denied Illinois Central's other request to set-off the amount of $792,000 for loss of household services; the denial of the $792,000 set-off is not challenged in this appeal.  We apply the standard of review applicable to Tenn. R. Civ. P. 59 and review the trial court's determination of whether to grant a motion to alter or amend a judgment under an abuse of discretion standard. Tenn. R. Civ. P. 59.04; *In re M.L.D.*, 182 S.W.3d 890, 895 (Tenn. Ct. App. 2005), appeal denied (citing *Stovall v. Clarke*, 113 S.W.3d 715, 721 (Tenn. 2003)).

38

Mrs. Russell asserts that the trial court erred in reducing her damages by $919,315 — the amount of Mr. Russell's medical bills paid by his medical insurance plan provided by Illinois Central. The order granting the motion to offset incorporated the following statements made by the court at the hearing on the motion:

> I've looked at what's been submitted, as well. And I look at this Health and Welfare Agreement of October the 22nd, 1975 to include the Plaintiff, Mr. Russell. And we've heard a lot about how much insurance was paid. It looks like Mr. Russell paid about $100 for his family coverage and the Railroad paid about roughly $1,076. . . . We do know that Ms. Russell has no medical bills. We do know that Mr. Russell had insurance and paid part of it. . . . There was a collective bargaining agreement and that this insurance policy paid for every bit of the $919,315.55, that could have been and probably would have been a detriment to Plaintiff's claim in that regard. The jury was left with, this Court submits and believes, with the impression that this is a medical bill that Ms. Russell has to pay.

The Plaintiff asserts the set-off was error for the following reasons: Defendant failed to plead the affirmative defense of set-off for amounts paid by the health insurer; Defendant failed to prove that Mr. Russell's medical bills were paid by it or Mr. Russell's health insurer; Mr. Russell's employment health insurance was a fringe benefit of his employment and, therefore, any insurance payments were a collateral source and not subject to set-off; and Mr. Russell contributed $100 per month to pay the premiums for his health insurance, making it a collateral source not subject to set-off.

### 1. Applicable Law

Actions brought under FELA are subject to the "Contract, rule, regulation, or device exempting from liability; set off" provision in Section 55, which states:

> Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void: Provided, that in any action brought against any such common carrier under or by virtue of any of the provisions of this chapter, such common carrier may set off therein any sum it has contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured employee or the person entitled thereto on account of the injury or death for which said action was brought.

45 U.S.C. § 55. Judge Friendly's concurring opinion in *Blake v. Delaware & H. Ry. Co.,* 484 F.2d 204 (2d Cir. 1973), a case in which the Second Circuit Court of Appeals interpreted this statute, resulted in the railroads and their employees negotiating a Health and Welfare Agreement, which includes the following language:[50]

### SPECIAL NOTICE CONCERNING CLAIMS AGAINST A PARTICIPATING RAILROAD FOR ON-DUTY INJURIES

The following is excerpted from the October 22, 1975 Health and Welfare Agreement:

In case of an injury or a sickness for which an Employee who is eligible for Employee benefits and may have a right of recovery against the employing railroad, benefits will be provided under the Policy Contract, subject to the provisions hereinafter set forth. The parties hereto do not intend that benefits provided under the Policy Contract will duplicate, in whole or in part, any amount recovered from the employing railroad for hospital, surgical, medical or related expenses of any kind specified in the Policy Contract, and they intend that benefits provided under the Policy Contract will satisfy any right of recovery against the employing railroad for such benefits to the extent of the benefits so provided. Accordingly, benefits provided under the Policy Contract will be offset against any right of recovery the Employee may have against the employing railroad for hospital, surgical, medical or related expenses of any kind specified in the Policy Contract. (Art. Ill, Sec. A.). [51]

_____

[50] In 1973, Second Circuit Court of Appeals decided *Blake v. Delaware & H. Ry. Co.* in which it interpreted 45 U.S.C. § 55 and rejected a railroad's right to set off the amount of medical bills paid on its employee's behalf. The concurring opinion of Judge Friendly stated the following:

Under 45 U.S.C. § 55, the railroad is entitled to set off only the premiums, not what the premiums bought. This was recognized as long ago as *Bangor & Aroostook R. Co. v. Jones*, 36 F.2d 886 (1 Cir. 1929). If the railroads wish to avoid the harsh result reached by the district court, they can accomplish this by specific provision in the collective bargaining agreement.

*Blake v. Delaware & H. Ry. Co*, 484 F.2d 204, 207 (2d Cir. 1973, Friendly, C.J., concurring). Judge Friendly's opinion prompted a renegotiation of the collective bargaining agreements between the nation's railroad companies and their employees' unions in 1975, resulting in the notice language quoted above. *CSX Transp., Inc. v. Williams*, 497 S.E.2d 66, 69 (Ga. Ct. App. 1998); *Ford v. Natl. R.R. Passenger Corp.*, 734 F. Supp. 215, 217 (D. Md. 1990).

[51] This language is included in the Railroad Employee National Health and Welfare Plan, which in the case at bar was relied upon by one of Plaintiff's expert witnesses and identified by Illinois Central's benefits administrator as being the document that would "tell[] [Mr. Russell] everything that is covered

Tennessee appellate courts have not been called upon to construe this language. The Georgia Court of Appeals addressed the provision in 1998 in a case in which the question before it was whether the amount of employee's medical expenses paid by a policy insuring railroad employees for on-the-job injuries should be offset against the employee's recovery. The court noted, "Since 1975, every federal court which has addressed the renegotiated collective bargaining agreement [which included the notice language quoted above] has held that payments under [the group insurance policy] are not from a collateral source and are not fringe benefits and has offset those payments against the plaintiff's recovery." *CSX Transp., Inc. v. Williams*, 497 S.E.2d 66, 69 (Ga. Ct. App. 1998). The court held further, "The renegotiated collective bargaining agreement conclusively determines the issue, for the new agreement expressly stipulates [the group insurance policy's] payments are to be offset." *Id.* (citing *Folkestad v. Burlington Northern, Inc.,* 813 F.2d 1377, 1381 (9th Cir. 1987)). Given the historical context and weight of authority on this issue,[52] we conclude that the provision at issue in this case allows for set-off. With the foregoing in mind, we now address Mrs. Russell's specific contentions.

## 2. Whether Illinois Central Failed to Plead and/or Prove Set-Off

In its answer to the Complaint and each amendment, Illinois Central asserted it "was entitled to a set-off of any payments Defendant may have made on behalf of the decedent for medical bills, advances, or other benefits." Plaintiff contends that this language "only pleads the affirmative defense of seeking a set-off for bills paid by Defendant, not by Mr. Russell's employment health insurer," and thus precludes Defendant's recovery for amounts paid by any entity other than Illinois Central.

We disagree. Whether the bills were paid by Illinois Central or the health insurer

---

under medical [insurance coverage]."

[52] *See Varhol v. Nat. R. Passenger Corp.*, 909 F.2d 1557, 1565 fn. 1 (7th Cir. 1990); *Folkestad v. Burlington Northern*, 813 F.2d 1377 (9th Cir. 1987); *Muzzleman v. Nat. Rail Passenger Corp.*, 839 F.Supp. 1094, 1096–1097 (D.Del. 1993); *Ford v. Nat. R. Passenger Corp.*, 734 F.Supp. 215 (D.Md.1990); *Lyons v. Southern Pacific Transp. Co.*, 684 F.Supp. 909 (W.D.La.1988); *Mead v. Nat. R. Passenger Corp.*, 676 F.Supp. 92 (D.Md. 1987); *Kendig v. Consolidated R. Corp.*, 671 F.Supp. 1068 (D.Md.1987); *Brice v. Nat. R. Passenger Corp.*, 664 F.Supp. 220 (D.Md.1987); *Francis v. Nat. R. Passenger Corp.*, 661 F.Supp. 244 (D.Md.1987); *Clark v. Nat. R. Passenger Corp.*, 654 F.Supp. 376 (D.D.C.1987); *Nelson v. Penn Central R. Co.*, 415 F.Supp. 225 (N.D.Ohio 1976); *CSX Transp., Inc. v. Williams*, 497 S.E.2d 66, 70 (Ga. Ct. App. 1998); *Kalanick v. Burlington N. R. Co.*, 788 P.2d 901, 909 (Mont. 1990).

is of no consequence to this inquiry.[53]  The Answer was sufficient to make the court and the Plaintiff aware that Illinois Central would seek set-off.[54]

As to Mrs. Russell's assertion that no proof was presented to establish that Mr. Russell's medical bills were paid for by his health insurance or Defendant, the proof at trial established that Mr. Russell had insurance through his employer; that it was "good" insurance; and that none of his medical bills were outstanding.  Plaintiff presented the deposition testimony of Rosalyn Roberts, benefits administrator for Illinois Central, who testified that Mr. Russell "had insurance.  Medical, dental, vision and supplemental sickness benefits through the national plan.  Through the National Railway Labor Conference."  When asked if he had to pay for the insurance, she testified, "I think there is a hundred dollar cost share per the collective bargaining agreement."  She also identified the Railroad Employee National Health and Welfare Plan, saying it "tells [Mr. Russell] everything that is covered under medical."

Plaintiff also asserts there is no proof that Mr. Russell was subject to the National Health and Wellness Plan or that his insurance was provided pursuant to that Plan. Plaintiff filed the Plan as part of its expert witness disclosures, stating it had been supplied to Dr. David Sharp, an expert witness who would testify as to Mrs. Russell's economic loss.  We agree with Illinois Central that the record supports the court's findings that the plan applied to Mr. Russell, and we have not been cited to any evidence to the contrary.

### 3. *Nature of the Benefit*

Relying on cases which hold that if an employee contributes to his or her

---

[53] The language in the National Health and Welfare Plan, portions of which are quoted below, makes clear that the Plan, not the insurance company which administers the Plan's benefits, ultimately funds the benefits provided to Plan participants through the contributions made by employers and employees:

> "The Plan's Health Care Benefits described in this booklet are the Comprehensive Health Care Benefit ("CHCB"), the Mental Health and Substance Abuse Care Benefit ("MHSA"), the Managed Pharmacy Services Benefit ("MPSB"), and the Managed Medical Care Program ("MMCP").  These Benefits are not insured.  They are payable directly by the Plan. …
>
> The CHCB is administered either by Highmark Blue Cross Blue Shield ("Highmark") or United Healthcare ("UnitedHealthcare").  You may choose either of them to administer your program if you participate in the CHCB. …
>
> The Plan's Health Care Benefits are funded directly by the Plan.  They are not insured.

[54] Illinois Central also raised the issue of offset in a motion *in limine*.

insurance, benefits are regarded as collateral to the employer and set-off is prohibited, Mrs. Russell contends that the insurance plan for which Mr. Russell paid $100 a month is a fringe benefit, such that it would not be subject to set-off.[55]

Pursuant to 45 U.S.C. § 55, a common carrier, such as Illinois Central, may set off any sum it has contributed or paid on account of injury or death of its employee, but set-off is not permitted for those fringe benefits that compensate employees for their work. *See Ramsey v. Burlington N. and Santa Fe Ry. Co.*, 130 S.W.3d 646, 656 (Mo. Ct. App. 2004) (citing *Folkestad v. Burlington Northern, Inc.*, 813 F.2d 1377, 1381 (9th Cir.1987); *Clark v. Burlington Northern, Inc.*, 726 F.2d 448, 450 (8th Cir.1984)). The parties do not dispute that Mr. Russell paid $100 per month and that Illinois Central paid approximately $1,097 per month for medical insurance for Mr. Russell and his family, available pursuant to the National Health and Welfare Plan; this is the Plan which paid Mr. Russell's medical expenses. Reflective of the statutory authority at 45 U.S.C. § 55, the Plan provides that benefits provided under it will be offset against any recovery the employee may have against the employing railroad. In accordance with the rationale and holding in *CSX Transp. Inc. v. Williams*, discussed *supra*, the language of the Plan makes clear that the employee's recovery is to be reduced by the amount of benefits paid by the Plan. Mr. Russell's payment of one-tenth of the monthly premiums does not convert the plan to a fringe benefit, and we therefore hold that the amount of benefits paid pursuant to the Plan are proper for set-off.

The $4,255,000 verdict expressly included an award of $919,315 for medical expenses,[56] an amount which Mr. Russell was not responsible to pay. The evidence does not preponderate against a finding that this amount was paid by the Plan. Consequently, Plaintiff's recovery of that amount would constitute a double recovery in this case. The

---

[55] Ordinarily, the collateral source rule provides that a plaintiff's recovery for negligence is not diminished by payments from a collateral source such as an insurance company. See *Fye v. Kennedy*, 991 S.W.2d 754, 763 (Tenn. Ct. App. 1998) (adopting Restatement (Second) Of Torts (1977) § 920A(2), which states "Payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable"; Comment b to § 920A further explains, "Payments made or benefits conferred by other sources are known as collateral-source benefits. They do not have the effect of reducing the recovery against the defendant.")). *See also Folkestad v. Burlington N., Inc.*, 813 F.2d 1377, 1380 (9th Cir. 1987) (quoting the Restatement (Second) of Torts, § 920A).

[56] After the jury deliberated, the court read their verdict:

> … Number 5: Decide the total amount of damages sustained by the Plaintiff.
> ***
> Next: The reasonable expense of medical care and supplies reasonably needed by and actually provided to Milford R. Russell, Junior.
> The amount is written, $919,315.

amendment of the judgment was not an abuse of discretion; therefore, we affirm the ruling of the trial court setting off $919,315 from the jury's verdict.

## II. CONCLUSION

For the reasons set forth above, we find no reversible error and affirm the decision of the trial court.

_____
RICHARD H. DINKINS, JUDGE